**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ROBERT M. BECK,** *et al.***,** | ) | **CASE NO. 1:99 CV 1271** |
| | ) | |
| **Plaintiffs,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **CITY OF CLEVELAND,** *et al.***,** | ) | <u>**Memorandum of Opinion and Order**</u> |
| | ) | |
| **Defendants.** | ) | |

<u>**INTRODUCTION**</u>

This matter is before the Court upon plaintiffs' motion for summary judgment (Doc.
125) and defendants' motion for summary judgment (Doc. 124).  Plaintiffs allege defendants
violated the Fair Labor Standards Act ("FLSA") by denying plaintiffs the use of
compensatory time off ("comp time") when to grant the comp time would require defendants
to pay a replacement employee at overtime rates.  The Court previously granted summary
judgment to defendants on this question, finding the policy did not violate the FLSA.  The
Court of Appeals for the Sixth Circuit reversed this Court's decision and remanded the matter
for additional factual findings.  *Beck v. City of Cleveland*, 390 F.3d 912 (6th Cir. 2004).  For
the reasons that follow, plaintiffs' motion for summary judgment is GRANTED in PART and

DENIED in PART and defendants' motion for summary judgment is DENIED.

**FACTS**

Only those facts necessary for the resolution of the present motions are included herein.  Unless otherwise stated, the facts are taken from plaintiffs' statement of undisputed facts, to which defendants offered no counter-statement.

The City of Cleveland ("the City") and the Cleveland Police Department ("the Department") are defendants in this action brought under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*  Plaintiffs are current or former employees of the City who work or worked as patrol officers in the Department.

Officers work eight-hour shifts.  Some officers work on a seven-day schedule, working 40 hours in five days with two days off.  Other officers work on an eight-day schedule, working 48 hours in six days with two days off.  Officers who work overtime are compensated at an overtime rate equal to one and one-half times their regular hourly rate of pay.  All of the City's patrol officers, including plaintiffs, are represented by the Cleveland Police Patrolmen's Association ("CPPA").  The City and the CPPA are parties to a collective bargaining agreement ("CBA") that governs many of the terms and conditions of employment for patrol officers.  The provisions governing the use of comp time went into effect via Department Order 9-86 on April 15, 1986 and were later incorporated into the CBA.  The same provisions remain in effect today.

The CBA defines overtime as:  (1) all hours in excess of 40 hours in a work period for those officers assigned to a seven day work period; (2) all hours in excess of 48 hours in a work period for those officers assigned to an eight day work period; and (3) all hours worked

2

in excess of eight hours per day.  The CBA requires each officer to elect how he wishes to be paid for his overtime hours.  If he elects to be paid in cash, for every overtime hour worked he is paid one hour in cash and is granted 30 minutes in comp time.  If he elects to be paid with comp time, for every overtime hour worked he receives one and one-half hours of comp time. This comp time is placed in the officer's "FLSA comp time bank."  Each officer can bank up to 480 hours of FLSA comp time.  The FLSA requires that officers be paid in cash for all FLSA hours earned in excess of the 480-hour maximum.

The CBA further provides when officers may use accrued comp time:

> Compensatory time off shall be granted in accordance with operational needs and upon reasonable request by the employee requesting such compensatory time.  Requests for the use of accumulated compensatory time will be considered and granted to the employee who first requested the time off, unless an emergency exists.
>
> ***
>
> Overtime ... is, however, subject to the overtime provisions of the Fair Labor Standards Act.

CBA, Section 15.  Since at least 1997, it has been the policy of the Department to deny an officer his request to use comp time if allowing the request would require the Department to pay a replacement officer overtime.  The Department keeps no record of requests that are denied or the reasons for the denial.   Plaintiffs challenge defendants' policy for the years 1997 through 2006.

717 of the 1400 or so plaintiffs have submitted affidavits to the Court.  These 717 plaintiffs state that they had comp time denied between 1997 and 2006.  Some of the 717 also state that they refrained from requesting to use comp time between 1997 and 2006 because they believed their request would be denied.  Based on the affidavits, in each year between

3

1997 and 2006, an average of 497 officers were denied comp time.  The affidavits also demonstrate that in each year between 1997 and 2006, an average of 504 officers refrained from requesting comp time when they believed the request would be denied because a replacement officer would have to be paid overtime.

The Court previously bifurcated liability and damages.  The present motions go to liability only.  Plaintiffs move for summary judgment on the ground that defendants violated the FLSA.  Defendants move for summary judgment on the ground that they have not violated the FLSA, because to grant the use of comp time when doing so would require paying replacement officers at overtime rates would "unduly disrupt" the Department's provision of police services.  Each motion is opposed.

## **STANDARD OF REVIEW**

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material fact rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).  A fact is material only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

4

Once the moving party has satisfied its burden of proof, the burden then shifts to the

nonmoving party:

> When a motion for summary judgment is made and supported as
> provided in this rule, an adverse party may not rest upon the mere
> allegations or denials of the adverse party's pleading, but the
> adverse party's response, by affidavits or as otherwise provided in
> this rule, must set forth specific facts showing that there is a
> genuine issue for trial.  If the adverse party does not so respond,
> summary judgment, if appropriate, shall be entered against the
> adverse party.

Fed. R. Civ. P. 56(e).  The court must afford all reasonable inferences and construe the

evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of*

*Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 255); *see also United*

*States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th Cir. 1985).

Summary judgment is appropriate when a party who bears the burden of proof at trial

fails to make a showing sufficient to establish an essential element of his case.  *Tolton v.*

*American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).

"The mere existence of a scintilla of evidence to support plaintiff's position will be

insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."

*Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 252).

Moreover, if the evidence is "merely colorable" or is not "significantly probative," the court

may grant summary judgment.  *Anderson*, 477 U.S. at 249-50.  On cross-motions for

summary judgment, the Court "must evaluate each motion on its own merits."  *Wiley v.*

*United States*, 20 F.3d 222, 224 (6th Cir. 1994).

### **DISCUSSION**

The FLSA, as amended in 1985, provides in relevant part:

5

(o) Compensatory time

(1) Employees of a public agency which is a State, a political subdivision of a State, or an interstate governmental agency may receive, in accordance with this subsection and in lieu of overtime compensation, compensatory time off at a rate not less than one and one-half hours for each hour of employment for which overtime compensation is required by this section.

(2) A public agency may provide compensatory time under paragraph (1) only--
     (A) pursuant to--
          (i) applicable provisions of a collective bargaining agreement, memorandum of understanding, or any other agreement between the public agency and representatives of such employees; or
          (ii) in the case of employees not covered by subclause (i), an agreement or understanding arrived at between the employer and employee before the performance of the work
                                    ***
(5) An employee of a public agency which is a State, political subdivision of a State, or an interstate governmental agency—
(A) who has accrued compensatory time off authorized to be provided under paragraph (1), and
(B) who has requested the use of such compensatory time,
*shall* be permitted by the employee's employer to use such time within a reasonable period after making the request if the use of the compensatory time does not *unduly disrupt* the operations of the public agency.

29 U.S.C. § 207(o)(5) (emphases added).[1]

_____

[1]

Prior to 1985, the provisions of the FLSA requiring the payment of time and a half for overtime did not apply to the states.  In *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985), the Supreme Court held that the FLSA did apply to the states.  As a result, states were then required to pay overtime in cash; comp time was not permitted under the FLSA at that time.  To address the concern of local governmental entities worried about the cost to pay overtime, Congress amended the FLSA.  *See* Pub. Law 99-150 (1985).  The 1985 amendment to the FLSA, effective April 15, 1986, permitted a political subdivision to pay overtime hours with comp time rather than cash if there is an agreement with the employee.  29 U.S.C. §

Defendants admit that "the Department does not call substitute officers at an overtime rate to allow the use of compensatory time beyond the particular day's car plan."  Affidavit of Deputy Chief Timothy Hennessy.[2]  Thus, the only question is whether this policy violates the FLSA.  Plaintiffs argue that summary judgment must be granted to plaintiffs as to liability if even one request for the use of comp time was denied where such a request would not have unduly disrupted the Department's operations.  Defendants argue that the City and Department are in such dire financial straights that all of plaintiffs' requests would have, collectively, unduly disrupted police operations and, thus, were properly denied.

The Secretary of Labor's implementing regulations, issued in 1987, provide the following guidance on the term "unduly disrupt":

> When an employer receives a request for compensatory time off, it shall be honored unless to do so would be "unduly disruptive" to the agency's operations.  Mere inconvenience to the employer is an insufficient basis for denial of a request for compensatory time off.  For an agency to turn down a request from an employee for compensatory time off requires that it should reasonably and in good faith anticipate that it would impose an unreasonable burden on the agency's ability to provide services of acceptable quality and quantity for the public during the time requested without the use of the employee's services.

29 C.F.R. § 553.25(d).  The Secretary has also stated:  "The fact that overtime may be

_____

207(o)(2).  The relevant agreement in the present case is the CBA between the CPPA and the City.

[2]

The "car plan" represents the minimum number of officers needed during a work shift to provide adequate services to City residents.  Thus, if staffing for a shift is at the minimum level necessary, to grant a comp time request would require bringing in an additional officer to work that shift.  Defendants do not bring in this additional officer if to do so would require he be paid overtime, and the comp time request is denied.

required of one employee to permit another employee to use compensatory time off would not be a sufficient reason for an employer to claim that the compensatory time off request is unduly disruptive."  August 19, 1994 Opinion Letter, U.S. Dept. of Labor, Wage and Hour Div., 1994 WL 1004861; *see also* 52 Fed. Reg. 2012, 2017 (1987) (Secretary's preamble to 29 C.F.R. § 553.25) (payment of overtime to one employee to allow another to use comp time "in and of itself, would not be sufficient for the employer to claim that it is unduly disruptive").

In its opinion in this matter, the Sixth Circuit held that "judicial deference is due to the Secretary's opinions that the payment of overtime to honor an officer's request for compensatory time does not qualify as unduly disruptive under Section 207(o)(5)."  *Beck*, 390 F.3d at 914.  Thus, defendants cannot deny timely comp time requests solely because to do so would require payment of overtime.  *Id.*[3]  The Sixth Circuit then held that

> the City has not proved that granting the Police Officers' otherwise timely requests for compensatory leave would result in an unreasonable financial burden and thereby cause an undue disruption of its operations.  Absent a clear showing by the City of undue disruption of its police services, due to severe financial constraints to pay overtime to substitute officers, the City's denials of Police Officers' timely requests for accrued compensation leave must be held to violate Section 207(o)(5).

*Id.*

---

[3]

In its discussion of whether or not the Secretary's opinion is due deference, the Sixth Circuit quotes a paragraph that is attributed to *DeBraska v. City of Milwaukee*, 131 F.Supp.2d 1032, 1036 (E.D. Wis. 2000).  *See Beck*, 390 F.3d at 919.  However, the quoted language actually appears to be from a brief filed by a police officers' union in a different FLSA case, *Houston Police Officers' Union v. City of Houston*, 330 F.3d 298 (5th Cir. 2003).

In determining what might constitute an undue disruption, the Sixth Circuit directs the Court to two decisions it considers instructive.  In *DeBraska v. City of Milwaukee*, 131 F.Supp.2d 1032 (E.D. Wis. 2000), the district court granted partial summary judgment to plaintiffs.  Defendants had a policy of denying comp time if a replacement officer would be paid at an overtime rate.  However, defendants allowed the requesting officer to take his comp time on another date, almost always within one week of the originally requested date. Defendants argued that they were thus complying with the FLSA's requirement that all requests be granted within a reasonable period.  The court disagreed, siding with the Secretary of Labor.  The court held that the "reasonable period" provision of the FLSA requires defendants to act upon a request within a reasonable time and grant the requested date off unless to do so would cause an undue disruption.  However, neither party submitted any evidence as to whether there would be undue disruption if defendants were forced to call in replacement officers at overtime rates.  Thus, the court declined to reach the undue disruption issue.  In *Canney v. Town of Brookline*, 142 Lab. Cas. P34, 169 (D. Mass. 2000), the court also deferred to the Secretary of Labor's opinion that mere payment of overtime does not create undue disruption.  However, the court stated that it had insufficient evidence before it to determine whether or not the town actually denied any comp time where the replacement officer would have had to have been paid overtime.[4]

---

[4]

       The Sixth Circuit also distinguished its earlier ruling in *Aiken v. City of Memphis*, 190 F.3d 753 (6th Cir. 1999).  *Aiken*, like this case, involved a policy to deny comp time where granting it would require overtime payment to a replacement police officer.  The *Aiken* court held that the policy did not violate the FLSA, because the parties' collective bargaining agreement permitted defendants to deny comp time requests if a shift was at minimum staffing levels.  The *Beck*

9

In light of *DeBraska* and *Canney*, the Sixth Circuit determined that additional evidence was required before a determination of undue disruption could be made.  The Sixth Circuit stated:

> to rely upon the financial impact of paying overtime to substitute officers to justify denial of compensatory leave under Section 207(o)(5), the public employer must present clear proof of disruption of services.  This record, however, does not allow us to reach a conclusion on whether the financial impact on the City from granting the Police Officers' timely requests for compensatory leave would establish "undue disruption" of police services within the meaning of Section 207(o)(5).
>
> The City did not present any proof of the financial impact on the police department's budget from the Police Officers' timely leave request.  The City did not offer any proof as to how that sum impacted the City's finances.  The district court inferred an adverse financial impact upon the City based solely on the amount of the Police Officers' accumulated leave.  The City did not present any proof on the total amount of compensatory leave denied Police Officers under its policy, a factor that if high enough would defeat the congressional purpose in establishing compensatory leave for public employees.  Nor is there expert proof that the City's operational needs would be unduly disrupted by granting the Police Officers' leave requests.  Based upon the testimony of the union's president, there is a material factual dispute on whether the City's car unit plan is the actual basis for determining a police unit's operational needs.
>
> In our view, invalidation of the Police Officers' statutory rights under Section 207(o)(5) requires a clear showing of the City's entitlement to the undue disruption exception to awards of accumulated compensatory leave.  The Police Officers' compensatory leave requests must be granted absent "clear and affirmative evidence" of an undue disruption of the City's provision of police services for its citizens that is the controlling consideration under the "unduly disrupt" standard in Section 207(o)(5).

panel distinguished *Aiken* on the ground that it did not address the "unduly disrupt" provision of the FLSA.

10

*Beck*, 390 F.3d at 926.  Thus, the Sixth Circuit's opinion requires evidence of the impact on the finances of both the Department and the City.  Accordingly, the parties have submitted evidence of the number of denied requests and requests never made for fear of denial, the cost of those requests, and the ability of defendants to pay that cost.

 In support of their motion for summary judgment, plaintiffs rely upon the affidavits of 717 officers, which state that each of these 717 officers was denied comp time at least once from 1997 to 2006.  Not all of the 717 plaintiffs were denied comp time use in every relevant year.  On average, 497 plaintiffs were denied comp time use each year.  On average, there were ten denials per plaintiff per year.  Further, on average 504 plaintiffs in each year stated that they refrained from requesting comp time where they assumed the request would be denied.  On average, these 504 plaintiffs refrained from requesting comp time nine times per year.  Defendants do not dispute the accuracy of the affidavits.  Nor do defendants dispute that each request, whether actually made or not, was denied or would have been denied because the replacement officer would have been paid overtime.[5]  However, defendants do take issue with plaintiffs' method of calculating the cost of the overtime payments.

 According to plaintiffs' expert Ronald York, the overtime could have been paid from the City's General Fund.  The Department's budget is paid from the City's General Fund.  For none of the relevant years did the City expend all of its authorized budget.  That is, the City had "unexpended appropriations" in the General Fund for each year from 1997 through 2006.  Plaintiffs' expert obtains all of the relied upon data from the City's annual financial reports.

---

[5]
  Defendants do point out that, on average, each officer was granted 15 comp days and 20 sick days per year.

11

These unexpended appropriations consist of dollars budgeted to various departments but not spent by those particular departments.  The cost to approve each of the denied and never-requested comp time requests was calculated by Mr. York by multiplying the cost of an overtime hour by the number of comp time hours denied or not requested per year.

In arriving at the number of comp time hours denied or not requested per year, Mr. York looked to plaintiffs' affidavits.  It is important to note that the City does not keep a record of the number of comp time requests that it denies or the reasons for denial.  Thus, the affidavits are the only evidence on this point.  Some plaintiffs were unable to state an exact number of comp time days they were denied or never requested in any given year.  For example, plaintiff Richard Adams reports being denied "10-15" comp days in 1998.  In order to calculate the cost to the City if these comp time requests had been granted, Mr. York took the highest number in the given range.  That is, for plaintiff Richard Adams, Mr. York assumed that he requested 15 comp days rather than 10.  Mr. York also assumed that Richard Adams had accumulated enough comp time to actually take those 15 days.  This, Mr. York explains, allowed him to arrive at a *maximum potential* cost to the City.[6]  This maximum potential cost to defendants is listed in the table below along with the unexpended appropriations.

| Year | Unexpended Appropriations | Cost to Grant Denied Requests (per plaintiffs) | Cost of Requests not Made (per plaintiffs) |
|------|---------------------------|------------------------------------------------|--------------------------------------------|
| 1997 | $3,776,000 | $1,441,102 | $1,296,647 |

---

[6]     The Court accepts plaintiffs' maximum potential cost for the purposes of this Opinion but makes no determination as to the actual damages at this stage.

12

| 1998 | $3,398,000 | $1,633,145 | $1,413,005 |
| 1999 | $1,768,000 | $1,778,246 | $1,595,947 |
| 2000 | $11,328,000 | $1,842,479 | $1,645,649 |
| 2001 | $5,143,000 | $1,766,966 | $1,581,865 |
| 2002 | $5,097,000 | $1,597,863 | $1,531,147 |
| 2003 | $9,936,000 | $1,662,598 | $1,565,710 |
| 2004 | $7,497,000 | $1,831,007 | $1,696,421 |
| 2005 | $7,059,000 | $1,705,229 | $1,612,921 |
| 2006 | $16,354,000 | $1,480,188 | $1,454,423 |
| TOTAL | $71,356,000 | $16,738,823 | $15,393,735 |

As the table demonstrates, the unexpended appropriations exceeded the maximum potential cost to defendants in every year except 1999.  Accordingly, Mr. York concludes that the City could have afforded the overtime payments to replacement officers.  Mr. York emphasizes that the cost of the overtime to replacement officers would have amounted to less than 1% of the City's revenues and expenses during the relevant years.  The City's total revenues averaged almost $453,000,000 per year.  Total expenditures averaged approximately $435,000,000 per year.  The City's Finance Director, Sharon Dumas, explains that the Department's expenditures accounted for $165,000,000 on average per year, or approximately 38% of the City's expenditures.[7]

---

[7]

    Neither party undertakes to explain the discrepancy between the various financial measures reported.  It appears that the City's expenditures are, on average, almost $20,000,000 per year less than the City's revenues.  Thus, it would stand to reason that the City would have, on average, $20,000,000 left over at the end of each year.  However, according to the City's financial reports, the unexpended appropriations amount to only approximately $3,000,000

Defendants make four primary arguments in opposition to plaintiffs' motion and in support of their own motion: (1) the evidence from the 717 plaintiffs' affidavits should be extended to account for all 1400 officers; (2) officers will "arbitrage" the system if they can use comp time any time they choose; (3) the unexpended appropriations relied upon by Mr. York as the source of funding ignore other City expenditures; and (4) even assuming plaintiffs' estimated costs are accurate, the overtime still would have caused undue disruption to the Department's operations.

Defendants first argue that the evidence from plaintiffs' affidavits can be extrapolated to account for all 1400 officers. The Court disagrees. Defendants' expert, Philip Brett, states that every one of the 1400 officers, rather than just the 717 who have submitted affidavits, should be considered.[8] The problem with Brett's assumption is that he offers no facts in support of it. To the contrary, there is evidence in the record that some officers choose not to use comp time; they save it for payment upon retirement. Moreover, defendants do not retain any record of denied comp time requests. So, the only evidence of the number or percentage of officers who were denied comp time comes from plaintiffs' affidavits. Only 497 of the 717 plaintiffs who submitted affidavits stated that comp time was denied them in any given year, and only 504 state they refrained from requesting comp time for fear it would be denied. If anything, the affidavits establish that only a percentage of officers in any given year would

per year on average. And, the unencumbered cash balance, discussed below, is even less.

[8]

Defendants' motion states that 714 plaintiffs submitted affidavits. According to plaintiffs, three additional plaintiffs submitted affidavits after their expert, Ronald York, was deposed, thus bringing the total number of affidavits to 717.

request and be denied comp time.  Because defendants do not provide any evidence on which to base an assumption that every one of the City's 1400 police officers would have been denied ten comp days per year and refrained from requesting nine additional days per year from 1997 to 2006, the Court declines to adopt defendants' estimates of the cost to pay replacement officers at overtime rates.

Defendants also rely on Mr. Brett's argument that if officers are allowed to use comp time any time they choose, the officers will "arbitrage" the system.  That is, an officer will always work as much overtime as he can and use all of his comp time on his regularly scheduled work days such that the cost to defendants would increase dramatically.  However, Mr. Brett presents no evidence to support his theory.  He presents no evidence that every officer would choose to be paid in comp time or that every officer would choose to use all of his comp time.  In fact, as mentioned above, there is evidence that some officers choose to save their comp time for a payout at retirement.

Next, defendants assert that Mr. York misrepresents the amount of cash available in the City's coffers.  Mr. York relies upon the unexpended appropriations, which are dollars that are budgeted for but not spent by the department for which they were budgeted.  Defendants explain in their opposition to plaintiffs' motion that the unexpended appropriations "do not include amounts transferred out for other purposes.  During each year the City Administration can transfer money in or out of the General Fund to meet other financing needs."  Thus, defendants, argue, it is inappropriate for plaintiffs to rely on unexpended appropriations as the potential source for overtime payments.  Instead, defendants state that the "unencumbered cash balance" more accurately reflects the amount of

15

money the City has at the end of each year.  The unencumbered cash balance is the amount of money in the General Fund that is unobligated cash.  It is equal to "total revenues minus total expenditures including transfers plus the beginning year fund balance and decertification of prior year encumbrances."  The unencumbered cash balance at the beginning of each year is reported in the table below next to plaintiffs' estimates of the combined cost of overtime for denied requests and requests never made.

| Year | Year-End Unencumbered Cash | Plaintiffs' Combined Estimated Cost |
|------|---------------------------|-------------------------------------|
| 1997 | $554,000 | $2,738,000 |
| 1998 | $2,491,000 | $3,046,000 |
| 1999 | $3,660,000 | $3,374,000 |
| 2000 | $22,543,000 | $3,488,000 |
| 2001 | ($896,000) | $3,349,000 |
| 2002 | $2,634,000 | $3,129,000 |
| 2003 | $2,824,000 | $3,228,000 |
| 2004 | $2,998,000 | $3,527,000 |
| 2005 | $13,924,000 | $3,318,000 |
| 2006 | $20,267,000 | $2,935,000 |

The table above demonstrates that the City had a positive unencumbered cash balance in all but one of the relevant years.  However, the estimated maximum cost of overtime exceeds the unencumbered cash balance in six of the ten relevant years.  Defendants also emphasize that the average unencumbered cash balance during the relevant time was only $7,100,000.  Ms. Dumas states this amount is sufficient to fund the operating expenses of the City for fewer than six days.  Finance Director Dumas further explains that this unencumbered cash is reserved for "extenuating circumstances" and would not have been

16

available, in any event, to pay overtime: "The City does not have the cash to supplement the Division of Police budget with additional funding from the General Fund for any purpose. Any increased expenses in the Division of Police budget will have to be financed through additional cuts in its own budget." Defendants also point out that plaintiffs' own expert recommends a cash reserve of three to six percent per year - an amount much higher than the City's current unencumbered cash balance.

Defendants argue that if the Department were required to have paid overtime to replacement officers, the City would have laid off 50 additional police officers. They arrive at this number by reliance upon calculations made by Ms. Dumas. Ms. Dumas states that the average wage of a police officer is approximately $61,000 per year. Plaintiffs' estimated cost to defendants is approximately $3,000,000 per year. Thus, eliminating 50 officers would provide the Department with about $3,000,000 to pay overtime to replacement officers. Ms. Dumas further states that "those positions would have remained vacant through subsequent years. These layoffs would further compromise the quality and quantity of services provided to the public."

In sum, defendants urge the Court to look at the unencumbered cash balance, as opposed to the unexpended appropriations, and find that because the unencumbered cash might have been insufficient to pay overtime to replacement officers, there was an undue disruption as a matter of law. However, defendants fail to explain how the unexpended appropriations were spent or to which departments the funds were transferred. Ms. Dumas' statements that no money was available and that officers would have been laid off are wholly conclusory. The Sixth Circuit stated that "clear and *affirmative* evidence" must be provided

17

before this Court may find an undue disruption.  Absent such evidence, the Court cannot say
that the otherwise unexpended funds should not have been transferred to the Police
Department to meet the defendants' statutory obligations to fund overtime to replacement
officers.

Defendants' final argument is that, even accepting plaintiffs' cost estimates, the City
simply did not have sufficient funds to pay overtime to replacement officers.  The affidavits
of Deputy Chief Timothy Hennessy and City Finance Director Sharon Dumas set forth the
many financial challenges the City has faced over the past decade.  Ms. Dumas states "[s]ince
1997, the City has transferred over eleven million dollars from the budgets of other
departments, or through supplemental appropriations, to balance the operating budget of the
Division of Police.  The transfers deplete the funds of other departments leaving the City
unable to offer the quantity and quality of services offered by those departments."[9]  In January
2002, the City placed a moratorium on hiring new officers.  This moratorium lasted until
October 2006.  In 2004, the City cut $59,000,000 from its budget overall, including
Department budget cuts, to address a money shortage.  The City also laid off 664 employees
including 250 patrol officers and 91 other Department employees in 2004.  As a result of the
lay offs and the hiring moratorium, the number of patrol officers has decreased from 1,546 in
2003 to 1,268 in 2007.

In 2004, the Department eliminated its Street Crime Unit, Aviation Unit, Fugitive
Unit, Gang Unit, Downtown Safety Unit and Neighborhood Police District Strike Force Unit.

---

[9]

      Ms. Dumas does not state more specifically when during the relevant
      years - 1997 to 2006 - these transfers actually took place.

Officers from these units were reassigned to basic patrol.  Still other units were reduced in size including the DARE Unit, Great Unit, Auto Theft Investigation Unit, Narcotic Unit and Intelligence Unit.  Defendants do not state when these units were reduced in size.

No wage increase was granted to officers in 2004 or 2005.  In 2006, the City administration mandated that each City department, including the Police Department, cut existing budgets by 3%.  Recently, 45 officers were assigned from Cleveland Hopkins Airport to basic patrol to help provide rudimentary police services to City residents.  Moreover, on May 1, 2008, the City will eliminate one of its six police districts.[10, 11]

Plaintiffs, in reply, insist that the money can come from somewhere.  Plaintiffs contend that if the City can find the funds to pay for the transfer of 45 officers from Hopkins Airport to basic patrol at a cost of approximately $3,000,000 for example, then surely it can find the funds to pay some $3,000,000 in overtime each year.  Plaintiffs acknowledge that the City might be forced to cut services but state that the City is obligated to do so in order to comply with the FLSA.  Plaintiffs even go so far as to say that running a deficit would not

---

[10]

Defendants also urge the Court to consider the effect of inflation on the City's purchasing power.  Defendants assert that, because of 4% inflation per year, each dollar buys fewer services than it did 10 years ago.  Plaintiffs state that the effect of inflation is already built in to the City's budget each year.  The Court agrees with plaintiffs that the City's purchasing power is not directly relevant.  The City must look at revenues and the expected cost of services and budget accordingly.

[11]

Defendants also ask the Court to consider the declining tax revenue base the City expects in the coming years.  Plaintiffs argue that future financial troubles cannot justify the past policy of denying comp time.  The Court agrees with plaintiffs and will not consider Ms. Dumas' statements about the future financial prospects of the City.

19

necessarily create an undue disruption to the Department as the City can borrow the money it would take to pay replacement officers at overtime rates.

In evaluating the parties' arguments, the Court finds it helpful to look at the various pieces of evidence together.  The following chart includes the unexpended appropriations, the unencumbered cash, plaintiffs' estimated maximum potential cost, and the various budget cuts per year.

| Year | Unexpended Appropriations | Unencumbered Cash | Maximum Potential Cost | Lay Offs and Other Cuts |
|------|---------------------------|-------------------|------------------------|-------------------------|
| 1997 | $3,776,000 | $554,000 | $2,738,000 | |
| 1998 | $3,398,000 | $2,491,000 | $3,046,000 | |
| 1999 | $1,768,000 | $3,660,000 | $3,374,000 | |
| 2000 | $11,328,000 | $22,543,000 | $3,488,000 | |
| 2001 | $5,143,000 | ($896,000) | $3,349,000 | |
| 2002 | $5,097,000 | $2,634,000 | $3,129,000 | hiring freeze |
| 2003 | $9,936,000 | $2,824,000 | $3,228,000 | hiring freeze |
| 2004 | $7,497,000 | $2,998,000 | $3,527,000 | hiring freeze; $59M budget cut; layoffs; Dept. units eliminated; no wage increase |
| 2005 | $7,059,000 | $13,924,000 | $3,318,000 | hiring freeze; no wage increase |
| 2006 | $16,354,000 | $20,267,000 | $2,935,000 | hiring freeze, 3% budget cut |

The Sixth Circuit has held that the Secretary of Labor's opinions are binding.  That is, defendants cannot deny comp time simply because granting such comp time would require the payment of overtime to a replacement officer.  For defendants to prevail, the Sixth Circuit

requires "clear and affirmative proof" from the defendants of undue disruption to the Department's operations.  *Beck*, 390 F.3d at 926.  Considering this burden and in light of the foregoing discussion, the Court finds that defendants have failed to submit such evidence with respect to the years 1997 through 2003.

For these years, defendants rely almost exclusively on budgetary reasons to support their denial of plaintiffs' requests.  There is little, if any, effort made to tie these budgetary constraints to any actual disruption in either police or city services.  Simply pointing out that the City may have been suffering some degree of financial hardship is insufficient, in and of itself, to establish an "undue disruption" in services.  At best, defendants point out that in 2002 and 2003 the Department was under a hiring freeze and was unable to bring in new officers.  Defendants fail, however, to explain the effects of the hiring freeze on the Department's ability to provide effective police services to its citizens.  The Court finds that this evidence is insufficient to establish a question of fact as to whether defendants are excused from compliance with the FLSA as the result of an undue disruption in services.  This is especially so given that the Sixth Circuit articulated that defendants must come forward with clear and affirmative evidence in order to be entitled to the undue disruption exemption.  Because defendants fail to come forward with sufficient evidence on this point, plaintiffs are entitled to summary judgment with respect to the years 1997 through 2003.

Although the Court finds it to be a close call, the Court determines that a question of fact exists with regard to the years 2004 through 2006.  Unlike the period of 1997 through 2003, the Court finds that defendants have come forward with sufficient evidence to establish that they *may* be entitled to invoke the undue disruption exemption.  In 2004, the City was

21

forced to enact budgetary cuts of $59 million. Due to these budgetary constraints, the Department was forced to lay off 250 police officers and 91 civilian employees. That same year, the Street Crime, Aviation, Fugitive, Gang, Downtown Safety and Neighborhood Police District Strike Force Units were eliminated. Officers from these units were reassigned to basic patrol, presumably to maintain basic peacekeeping efforts. No new class of police officers assumed patrol duty until 2007. In 2005, an arbitrator held that the City was unable to pay even a 1% increase in wages. Two years later, the City's financial condition again required the Department to cut its budget by another 3%. Although the Court is somewhat disturbed that defendants did not fully explain the effects of these layoffs and reductions in units on its ability to provide effective protection services, the Court finds that defendants have presented sufficient evidence to create a question of fact as to whether the payment of overtime wages would have caused an undue disruption in services in light of the financial conditions of both the City and the Department. On its face, these actions would certainly appear to have a significant effect on the ability of the Department to provide adequate police protection. Defendants however, failed to present sufficient evidence to obtain summary judgment in their favor. Rather, they simply presented evidence of undue disruption sufficient to defeat plaintiffs' motion. Accordingly, summary judgment is not warranted with respect to years 2004 to 2006.

### **CONCLUSION**

For the foregoing reasons, plaintiffs' motion for summary judgment is GRANTED in PART and DENIED in PART and defendants' motion for summary judgment is DENIED.

IT IS SO ORDERED.


                     /s/ Patricia A. Gaughan
                    PATRICIA A. GAUGHAN
                    United States District Judge


Dated: 2/20/08